FILED
John E. Triplett, Clerk of Court
United States District Court

*By jamesburrell at 2:55 pm, Jun 04, 2025*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **INDICTMENT NO.**   1:25cr-36 |
| | ) | |
| v. | ) | **18 U.S.C. § 1347** |
| | ) | **Health Care Fraud** |
| **MIRA STALLINGS** | ) | |
| | ) | **18 U.S.C. § 1343** |
| | ) | **Wire Fraud** |

## THE GRAND JURY CHARGES THAT:

At all times relevant to this Indictment, unless otherwise indicated:

1.      ABAscape LLC ("ABAscape") was a Georgia limited liability company, formed in or around March 2018,[1] and located at 2171 Foster Sprouse Road, Thomson, Georgia 30824.   ABAscape purported to provide behavioral therapy services to individuals with developmental disabilities.

2.      Mira Stallings ("**STALLINGS**") was a registered behavioral therapist ("RBT") residing and practicing in McDuffie County in the Southern District of Georgia. **STALLINGS** was the registered owner of ABAscape and was the sole signatory on the bank accounts into which TRICARE reimbursements to ABAscape were deposited, namely, SouthState Bank account ending in x3322 (the "Account").

3.      C.L. and M.L. were minor TRICARE beneficiaries living in the Southern District of Georgia. They were clients of ABAscape.

---

[1] ABAscape operated under Tax Identification Number xxxxx6832 between approximately March 2018 and August 2021 and under Tax Identification Number xxxxx4490 beginning in approximately September 2021 and continuing to the present.   The change in Tax Identification Numbers roughly corresponded with ABAscape's first registration with the Georgia Secretary of State in July 2021.

## The TRICARE Program

4.     TRICARE was a health care insurance program of the United States Department of Defense ("DOD").  TRICARE provided civilian health benefits for military personnel, military retirees, and military dependents worldwide.  The TRICARE program provided medical coverage for Uniformed Service members including those who were active duty and reservists of the following: U.S. Army, U.S. Air Force, U.S. Navy, U.S. Marine Corps, U.S. Coast Guard, Commissioned Corps of the U.S. Public Health Service, Commissioned Corps of the National Oceanic and Atmospheric Association, National Guard/Reserve, Army National Guard, Army Reserve, Navy Reserve, Marine Corps Reserve, Air National Guard, Air Force Reserve, and U.S. Coast Guard Reserve and their families.  This program also covered survivors, former spouses, Medal of Honor recipients and their families, and others registered in the Defense Enrollment Eligibility Reporting System ("DEERS").  The Defense Health Agency ("DHA"), an agency of the DOD, oversaw and administered TRICARE.

5.     TRICARE was a "health care benefit program" that affected commerce as defined in 18 U.S.C. § 24(b) and a "federal health care program" as defined in 42 U.S.C. § 1320a-7b(f).

6.     There were two types of beneficiaries under the TRICARE program: (a) Sponsors, who were active duty, retired, and Guard/Reserve members; and (b) Family Members, who were spouses and children who were registered in DEERS.

7.    Registered behavioral therapists and other health care providers, all of which provided services to beneficiaries, were able to apply for and obtain a "provider number." A health care provider that received a provider number was able to file claims with TRICARE to obtain reimbursement for services provided to beneficiaries.

8.    To participate in TRICARE, providers were required to submit an application in which the providers agreed to abide by the policies and procedures, rules, and regulations governing reimbursement. To receive funds, enrolled providers, together with their authorized agents, employees, and contractors, were required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations issued by DHA, relevant state and federal agencies, and authorized agents and contractors. Health care providers were given and provided with access to manuals and services bulletins that described proper billing procedures and billing rules and regulations.

9.    TRICARE regulations required health care providers to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records that documented actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the providers. TRICARE required complete and accurate patient medical records so that TRICARE would be able to verify that the services were provided as described on the claim form. These records were required to be sufficient

3

to permit TRICARE, or its contractors, to review the appropriateness of payments made to the health care provider.

10.     TRICARE paid for claims only if the items or services were medically reasonable, medically necessary for the treatment or diagnosis of the patient's illness or injury, documented, and actually provided as represented to TRICARE.

11.     The American Medical Association assigned and published numeric codes used to describe medical procedures performed by health care providers, commonly referred to as Current Procedural Terminology or "CPT" codes. CPT codes were intended to accurately identify, simplify, and standardize billing for medical services. TRICARE reimbursed providers specific amounts, which were determined by TRICARE based on, among other factors, the work involved in the procedure and the complexity of the procedure. Health care providers used specific CPT codes to describe the services that they claimed were provided, and health care benefit programs, including TRICARE, relied on the submitted CPT codes to decide whether to issue or deny reimbursement.

12.     Specific CPT codes were assigned to behavioral therapy services, with different codes delineating certain aspects of the service, including type, complexity, and duration. TRICARE and other health care benefit programs reimbursed health care providers at increasing rates based on the level of complexity indicated by the CPT code used to describe the therapy service. The higher number codes were generally reserved for more complex and longer services.

13.     At all times relevant here, CPT codes provided in relevant part:

4

| CPT Code | Descriptor |
|----------|------------|
| 97151 | Behavior identification assessment, administered by a physician or other qualified health care professional, each 15 minutes of the physician's or other qualified health care professional's time face-to-face with patient and/or guardian(s)/caregiver(s) administering assessments and discussing findings and recommendations, and non-face-to-face analyzing past data, scoring/interpreting the assessment, and preparing the report/treatment plan |
| 97153 | Adaptive behavior treatment by protocol, administered by technician under the direction of a physician or other qualified health care professional, face-to-face with one patient, each 15 minutes |
| 97155 | Adaptive behavior treatment with protocol modification, administered by physician or other qualified health care professional, which may include simultaneous direction of technician, face-to-face with one patient, each 15 minutes |
| 97156 | Family adaptive behavior treatment guidance, administered by physician or other qualified health care professional (with or without the patient present), face-to-face with guardian(s)/ caregiver(s), each 15 minutes |

14.    For reimbursement from TRICARE, behavioral therapy services should have been billed according to the standards outlined in the above table. If a service was billed at a higher level than what occurred during the visit, that service was "upcoded" or coded at a higher level than warranted for the service.

15.    Health care benefit programs like TRICARE would not knowingly reimburse for upcoded claims or claims for services that were not rendered at all.

### The COVID-19 Pandemic and the CARES Act

16.    The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or about March 2020 designed to provide emergency financial assistance to the millions who were suffering the economic effects caused by the COVID-19 pandemic. Among other relief efforts, the United States sought to provide

financial support to eligible businesses that could be used to offset certain business expenses. The Small Business Administration ("SBA") was an executive branch agency of the United States government that provided support to entrepreneurs and small businesses. The SBA's mission was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters. As part of this effort, the SBA enabled and provided for loans through banks, credit unions, and other lenders. These loans had government-backed guarantees. In addition, the SBA provided loans that came directly from the United States Government.

### Economic Injury Disaster Loans ("EIDL")

17. One source of relief provided by the CARES Act was the authorization for the SBA to provide EIDLs to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic. In order to obtain an EIDL, a qualifying business had to submit an online application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the twelve-month period preceding the disaster, and the cost of goods the business sold in the twelve-month period preceding the disaster. In the case of EIDLs, the twelve-month period was that preceding January 31, 2020. The applicant also had to certify that all the information in its application was true and correct to the best of the applicant's knowledge. EIDL applications were submitted directly to the SBA online at https://covid19relief.sba.gov/#/ and processed by the agency with support from a government contractor, Rapid Finance. The amount of each loan was

determined based, in part, on the information provided by the application about employment, revenue, and cost of goods, as described above. Any funds issued under an EIDL were issued directly by the SBA. EIDL funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments—collectively referred to as "operating expenses" in this application.

18.    For loan applications prior to April 6, 2021, EIDL loans were intended to cover six months of gross margin, less any original advances and other compensation. Thus, the intended loss was calculated as gross revenues ("GR") submitted for the twelve months prior to the disaster minus cost of goods sold ("COGS") submitted for the twelve months prior to the disaster divided by two less the original advance and compensation from other sources. If any of the calculations were above $150,000 after deducting the original advance and compensation from other sources, the amount was limited to $150,000 (loan cap at the time).[2]

---

[2] NOTE: Only the original EIDL advances are deducted from eligibility because it is a duplication of benefits. The targeted EIDL advance and the supplemental targeted EIDL advances are not a duplication of benefits and are not deducted from eligibility.

## COUNTS ONE THROUGH FOUR
### *Health Care Fraud*
### 18 U.S.C. § 1347

19.     Paragraphs 1 through 15 of this Indictment are incorporated by reference as if fully set forth herein.

20.     From in or around June 2020, and continuing through at least May 2023, in the Southern District of Georgia and elsewhere, the Defendant,

## MIRA STALLINGS,

did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud the TRICARE Program and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of the TRICARE Program, in connection with the delivery of and payment for health care benefits, items, and services.

### Purpose of the Scheme and Artifice

21.     It was the purpose of the scheme and artifice for **MIRA STALLINGS** to unlawfully enrich herself by: (a) submitting and causing the submission of false and fraudulent claims to TRICARE, on behalf of ABAscape, for individual and group behavioral therapy services that were not provided at all or not provided as represented; (b) receiving and obtaining the reimbursements paid by TRICARE based on the false and fraudulent claims submitted; and (c) diverting proceeds of the fraud for her personal use and benefit, and to further the fraud.

8

## Manner and Means of the Scheme and Artifice

22.    **MIRA STALLINGS** submitted, and caused the submission of, claims to TRICARE purporting that individual and group behavioral therapy services were being provided to TRICARE beneficiaries by ABAscape personnel, when in fact, these purported services were either not provided at all or were provided by an unqualified and/or an unlicensed individual.

23.    From in or around June 2020, and continuing through at least May 2023, **MIRA STALLINGS** submitted, and caused the submission of, approximately $652,643 in false or fraudulent claims to TRICARE on behalf of ABAscape. TRICARE paid approximately $572,571 for those claims.

24.    **MIRA STALLINGS** submitted claims to TRICARE for services purportedly provided to C.L. and M.L. by registered RBT A.C. between November 17 and December 26, 2021, although A.C. did not start working with C.L. and M.L. until approximately December 28, 2021.

25.    **MIRA STALLINGS** routinely submitted claims to TRICARE for eight hours' worth of services purportedly provided to C.L. and M.L. by RBT A.C. when in fact A.C. had provided far fewer hours' worth of services. The following are non-exhaustive examples:

      a. A.C. worked 18.5 hours during the week of January 3, 2022, averaging four hours per day, but **MIRA STALLINGS** billed TRICARE for each day of this week at eight hours per day.

b. A.C. worked 16 hours during the week of January 17, 2022, which included a holiday on which no services were rendered, but **MIRA STALLINGS** billed TRICARE for each day of this week at eight hours per day.

c. A.C. worked 23.5 hours during the week of March 3, 2023, averaging six hours per day, but **MIRA STALLINGS** billed TRICARE for each day of this week at eight hours per day.

26.    **MIRA STALLINGS** submitted claims to TRICARE for services purportedly provided to M.L. by RBT S.K. between September 1, 2021 and December 31, 2021 and between June 1, 2022 and March 23, 2023, although S.K. only provided services to M.L. between January 1 and May 31, 2022.

27.    **MIRA STALLINGS** submitted claims to TRICARE for services she claimed she had provided to C.L. and M.L. from 2020 to 2023. In fact, **MIRA STALLINGS** never provided services to C.L. or M.L. during this time period.

<u>Acts in Execution of the Scheme and Artifice</u>

28.    To execute and attempt to execute the scheme and artifice, in McDuffie County, within the Southern District of Georgia and elsewhere, **MIRA STALLINGS** submitted and caused to be submitted false and fraudulent claims to TRICARE, on behalf of ABAscape, including but not limited to those set forth in the table below on or about the dates listed below and for the patients listed below, when **MIRA STALLINGS** knew that her claims were not for actual adaptive behavioral therapy

10

services rendered to patients despite representations in her claims that such services took place:

| Count | TRICARE Beneficiary | Date Services Purportedly Provided | Approximate Amount Billed to TRICARE | Services Claimed |
|---|---|---|---|---|
| 1 | C.L. | 11/17/2021 | $580.80 | 97153, 12 units, RBT A.C. |
| 2 | C.L. | 01/17/2022 | $580.80 | 97153, 12 units, RBT A.C. |
| 3 | M.L. | 09/1/2021 | $580.80 | 97153, 32 units, RBT S.K. |
| 4 | M.L. | 03/10/2023 | $1,111.36 | 97153, 32 units, RBT M.S. |

All done in violation of Title 18, United States Code, Section 1347.

## COUNT FIVE
### *Wire Fraud*
### 18 U.S.C. § 1343

29. Paragraphs 16 through 18 of this Indictment are incorporated by reference as if fully set forth herein.

30. Beginning at least as early as October 2021, and continuing to in or about May 2023, in McDuffie County, within the Southern District of Georgia and elsewhere, the Defendant,

### MIRA STALLINGS,

knowingly devised and intended to devise a scheme and artifice to defraud the Small Business Administration, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

### Purpose of the Scheme and Artifice

31. It was the purpose of the scheme for **MIRA STALLINGS** to unlawfully enrich herself by, among other things, obtaining EIDL proceeds under false and fraudulent pretenses.

### Manner and Means of the Scheme and Artifice

### *ABAscape's EIDL Application*

32. On or about October 4, 2021, **MIRA STALLINGS** electronically submitted an application for an EIDL in the name of ABAscape (the "EIDL Application"). **MIRA STALLINGS** signed the EIDL Application and certified that all information in the application and supporting documents was true and correct.

33. Based on **MIRA STALLINGS'** representations in the EIDL

12

Application, and the documents submitted in support thereof, the SBA approved the application and authorized a loan in the amount of $500,000.

34.    On or about October 23, 2021, **MIRA STALLINGS** signed a Loan Authorization and Agreement, along with a related Security Agreement, on behalf of ABAscape.  In those agreements, among other representations, **MIRA STALLINGS** certified that:

   a. "Borrower will use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter[.]"

   b. "[N]one of the Obligations are or will be primarily for personal, family, or household purposes[.]"

35.    **MIRA STALLINGS** electronically signed the Loan Authorization and Agreement under penalty of perjury and certified that she was authorized to apply for and obtain a disaster loan on behalf of ABAscape "in connection with the effects of the COVID-19 emergency."

36.    On or about October 28, 2021, based on **MIRA STALLINGS'** representations in the EIDL Application, the SBA, by means of interstate wire communication, disbursed a total of approximately $499,900 into the Account. Immediately prior to the disbursement, the Account balance was approximately $3,119.

37.    Based on **MIRA STALLINGS'** representations in the EIDL Application, the SBA, by means of interstate wire communication, disbursed an

13

additional $15,000 in EIDL advances into the Account in November 2021, which were commingled and spent simultaneously with other EIDL funds, as detailed in paragraph 48 below.

### *ABAscape's EIDL Modifications*

38.    On or about April 11, 2022, **MIRA STALLINGS** requested a modification of the EIDL Application ("Modification 1"), successfully asking that the loan amount be increased from $500,000 to $700,600.

39.    Based on **MIRA STALLINGS'** representations in the application for Modification 1, and the documents submitted in support thereof, the SBA approved the application and authorized an additional loan amount of $200,600.

40.    On or about April 12, 2022, **MIRA STALLINGS** signed a second Loan Authorization and Agreement, along with a related Security Agreement, on behalf of ABAscape.  In those agreements, among other representations and as she had certified in connection with the original EIDL Application, **MIRA STALLINGS** certified that:

a. "Borrower will use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter[.]"

b. "[N]one of the Obligations are or will be primarily for personal, family, or household purposes[.]"

41.    **MIRA STALLINGS** electronically signed this second Loan Authorization and Agreement under penalty of perjury and certified that she was

authorized to apply for and obtain a disaster loan on behalf of ABAscape "in connection with the effects of the COVID-19 emergency."

42.   On or about April 17, 2022, based on **MIRA STALLINGS'** representations in Modification 1, the SBA, by means of interstate wire communication, disbursed a total of approximately $200,600 into the Account. Immediately prior to the disbursement, the Account balance was approximately $10,241.

43.   On or about May 6, 2022, **MIRA STALLINGS** requested a second modification of the EIDL Application ("Modification 2"), successfully asking that the loan amount be increased from $700,600 to $950,100.

44.   Based on **MIRA STALLINGS'** representations in her application for Modification 2, and the documents submitted in support thereof, the SBA approved the application and authorized an additional loan amount of $249,500.

45.   On or about May 14, 2022, **MIRA STALLINGS** signed a third Loan Authorization and Agreement, along with a related Security Agreement, on behalf of ABAscape.   In those agreements, among other representations and as she had certified in connection with the original EIDL Application and Modification 1, **MIRA STALLINGS** certified that:

    a.   "Borrower will use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter[.]"

    b.   "[N]one of the Obligations are or will be primarily for personal,

family, or household purposes[.]"

46.    **MIRA STALLINGS** electronically signed this third Loan Authorization and Agreement under penalty of perjury and certified that she was authorized to apply for and obtain a disaster loan on behalf of ABAscape "in connection with the effects of the COVID-19 emergency."

47.    On or about August 30, 2022, based on **MIRA STALLINGS'** representations in Modification 2, the SBA, by means of interstate wire communication, disbursed a total of approximately $249,500 into the Account. Immediately prior to the disbursement, the Account balance was approximately $6,404.

### *Use of EIDL Funds*

48.    Between approximately October 28, 2021 and May 31, 2023, **MIRA STALLINGS** spent the approximately $965,000 in EIDL funds on a variety of personal, family, and household expenses, including:

a. Personal debts, including credit card payments and an approximately $54,000 payment to a debt collector;

b. Approximately $65,000 in payments to her husband, despite never issuing him a W-2 or 1099 for ABAscape. These checks were identified as being for things such as "ABA Help (Oct/Nov)," "Farm equipment," "Farm maintenance," "Fencing," and "Animal care," despite current and former ABAscape employees and clients confirming that all of the services purportedly rendered by ABAscape

were completed at patients' homes and that no farm animals or equipment were used in the therapy;

c.  Purchases from a number of online vendors and at various retail stores, such the PlayStation Network, the Disney Store, Home Depot, Chick-fil-a, Krispy Kreme, Starbucks, gas stations, and Target;

d.  Personal insurance and utility payments;

e.  Car payments of more than $14,000, including $13,000 on a new vehicle;

f.  Payments to contractors totaling approximately $50,000 for construction of a dog-breeding compound, although EIDL funds cannot be used for expansion of facilities or for repairing physical damages; and

g.  Employee **backpay** of approximately $75,000, despite the fact that **MIRA STALLINGS** had been timely receiving payment from TRICARE for services purportedly provided by ABAscape employees.

49.  While non-EIDL funds were disbursed into the Account during this time period, they were insufficient to cover the non-permitted expenditures from the Account.

All done in violation of Title 18, United States Code, Section 1343.

17

## FORFEITURE ALLEGATIONS

The allegations contained in Counts One through Five of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(7), and Title 28, United States Code, Section 2461(c).

Upon conviction of one or more of the charges alleged in Counts One through Four of this Indictment, the Defendant, **MIRA STALLINGS**, shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, which represents or is traceable to the gross proceeds obtained, directly or indirectly, as a result of such violation.

Furthermore, upon conviction of Count Five of this Indictment, the Defendant, **MIRA STALLINGS**, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to such violation.

If any of the property described above, as a result of any act or commission of the Defendant:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty,

18

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

A True Bill.


Foreperson

_____
Jennifer S. Thompson
Assistant United States Attorney
Lead Counsel

_____
Tara M. Lyons
Acting United States Attorney

_____
Tania D. Groover
Assistant United States Attorney
Chief, Criminal Division

19